**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| GEORGE GUTIERREZ, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 2021 CV 02211 |
| | ) | |
| CITY OF AURORA, *et al.*, | ) | Hon. Judge Jeremy C. Daniel |
| Defendants. | ) | |

## PLAINTIFF'S RESPONSE TO DEFENDANTS' POST-TRIAL MOTION

Plaintiff George Gutierrez, by and through his undersigned counsel, opposes Defendants'

motion, which should be denied for the following reasons:

### INTRODUCTION AND RELEVANT TRIAL EVIDENCE

On April 22, 2025, a jury determined that Defendant Cory McCue used excessive force

against Plaintiff George Gutierrez, awarding Mr. Gutierrez $50,000 in compensatory damages and

$1,000,000 in punitive damages. There was ample evidence at trial that McCue abused his

authority by using excessive force, maliciously and vindictively, and that Plaintiff suffered

significant injuries. The jury's verdict should not be disturbed.

Defendants' narrative improperly posits their version of disputed facts. Construed

favorably to Plaintiff, the trial evidence and reasonable inferences established the following

relevant facts, refuting Defendants' version and supporting the verdict.

George Gutierrez did not feel safe when he was pulled over in his own driveway for a

minor traffic violation and was asked to exit the vehicle, so he requested a supervisor. R.[1] 171:21-

23, 196:9-23, 198:1-18, 214:8-20, 216:6-20, 217:23-218:3, 229:19-230:4, 295:22-297:2; JX 1 at

:11-:20. A debate ensued about his request and Officer Meyers' order for Mr. Gutierrez to exit the

---

[1] R. refers to the trial transcript, attached in its entirety in Exhibit A to Defendants' motion. (Dkt. 112-1) JX refers to Joint Exhibits used at trial. (Dkt 112-2; dkt. 115: Def. Mot. Ex. B and digital upload)

vehicle. R. 171:16-23, 187:1-5, 224:15-225:21, 226:10-21, 296:7-297:2. During this time, Officers Meyers and McCue could see in Mr. Gutierrez's vehicle because his window was rolled down and officers shined flashlights in his car. R. 172:14-173:17, 185:13-19, 219:4-12, 221:20-25, 222:24-225:11, 226:22-227:8, 293:14-22, 300:4-9. The dispute between Meyers and Plaintiff was conversational; Plaintiff did not threaten, evade or physically resist the officers during this six-and-a-half-minute debate. R. 177:13-178:2, 188:16-22, 227:9-228:20, 230:23-232:22, 297:5-16; JX 1 at 6:19-12:50.

After calling a supervisor, but before the sergeant arrived, Meyers reached into Plaintiff's vehicle, prompting Plaintiff to roll up his window; however, Plaintiff stopped rolling it up so as not to injure Meyers. R.171:24-172:3, 173:19-174:10, 230:20-22, 234:17-20, 235:8-236:16, 238:23-239:21, 300:10-18, 301:1-7; JX 1 at 12:44-12:50. At this point, Meyers yanked the window out of the frame, shattering it, and Plaintiff put his hands up, stating, "My hands are right here." R. 174:11-16, 187:18-20, 239:22-240:2, 301:21-302:6, 302:13-14, 324:11-17, 326:13-17; JX 2 at :17-:46. Plaintiff kept his hands up in surrender while Meyers and McCue opened his car door, grabbed him out of the car, and took him to a van parked adjacently. R. 147:17-21, 177:2-178:2, 241:12-14, 242:16-245:12, 302:13-303:21; JX 2 at :35-:55. Plaintiff did nothing to resist, evade or threaten the officers while they extracted him. R. 177:2-178:2, 187:21-188:6, 188:16-22, 252:10-17, 303:1-305:7, 326:7-; JX 2 at :46-:54. With Plaintiff against the van, McCue "palmed [Plaintiff's head] like a basketball… and slammed it against the window of the van." R. 174:19-21.

The moments leading up to McCue's use of force were witnessed and recorded by Plaintiff's sister and niece, whose testimony and video evidence corroborated Plaintiff's testimony and captured McCue slamming Plaintiff's head into the van. R. JX 2. Their testimony and the

videos also showed that they approached the officers cautiously and non-threateningly, asking simply, "What did he do?" R. 170:2-171:15, 172:4-10, 181:19-182:11, 184:19-185:6, 187:5-12, 237:25-238:7; JX 1 at 12:32-12:42; JX 2 at :08-:50. Plaintiff's injuries consisted of a large lump on his head, throbbing pain, a diagnosed concussion, headaches and dizziness, and humiliation. R. 178:8-25, 306:8-15, 310:11-22, 311:3-22, 312:1-22, 335:15-338:21.

## ARGUMENT

I. **DEFENDANTS' RULE 50(b) MOTION SHOULD BE DENIED BECAUSE McCUE'S USE OF FORCE VIOLATED CLEARLY ESTABLISHED LAW**

### A. Legal Standard

Federal Rules of Civil Procedure 50(a) and 50(b), governing judgments as a matter of law, limit post-trial judgment in favor of a party only when "a reasonable jury would not have a legally sufficient evidentiary basis to find for the [non-moving] party." Fed. R. Civ. P. 50. "In deciding a Rule 50 motion, the court construes the evidence strictly in favor of the party who prevailed before the jury and examines the evidence only to determine whether the jury's verdict could reasonably be based on that evidence." *Passananti v. Cook County*, 689 F.3d 655, 659 (7th Cir. 2012). On a Rule 50 Motion, the Court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000). Just as qualified immunity was denied at summary judgment due to the requirement that the Court view the facts in a light most favorable to Plaintiff, it should be denied post-verdict where the same balance applies. *See Passananti*, 689 F.3d at 659.

### B. Officer McCue Used Unconstitutionally Excessive Force Against Mr. Gutierrez

Defendant McCue acted unreasonably by slamming Plaintiff's head against a van after Plaintiff had his hands up in surrender following his passively noncompliant refusal to leave the

vehicle. Construing the evidence in the light most favorable to Plaintiff, it is clear that McCue's force was unreasonable under the Fourth Amendment's objective standard.

Courts use the *Graham v. Connor* factors to assess the reasonableness of an officer's use of force. *Graham v. Connor*, 490 U.S. 386, 396 (1989) ((1) severity of the crime at issue, (2) whether suspect poses an immediate threat to officers or others, and (3) whether he is actively resisting or evading arrest). It was undisputed that the severity of the crime (failure to signal within 100 feet and obstruction for refusing to exit the vehicle) was minimal. Ample evidence demonstrated that Plaintiff was not a threat and was not actively resisting or evading arrest during the stop.

Crucially, just prior to McCue's use of force, Plaintiff immediately placed his hands in the air when Officer Meyers broke the car window and stated: "My hands are right here." Courts have repeatedly recognized conduct like Plaintiff's conduct as an act of surrender. *See, e.g.*, *Brumitt v. Smith*, 102 F.4th 444, 449 (7th Cir. 2024); *see also Strand v. Minchuk*, 910 F.3d 909, 917. After conveying his surrender, Plaintiff did not resist Officer Meyer and McCue as they removed him from the vehicle and took him to the adjacent van. McCue then inflicted wholly gratuitous force against Plaintiff, when McCue grabbed Mr. Gutierrez's head and slammed it into the van.

Defendants argue, without applying cited case law to the present facts, that officers have to make split-second judgments in tense, rapidly evolving situations. Dkt. 112 at 5-6. The evidence presented to the jury showed a lengthy, yet cordial verbal exchange that only escalated when Meyers reached into Plaintiff's car. Meyers did this after he had called for the requested supervisor who was minutes away. R. 350:13-352:6. Immediately after Meyers broke the car window, Plaintiff conveyed his surrender. Plaintiff remained stationary, with his hands raised, while officers unlocked the car and opened the door, and Plaintiff stepped out of the vehicle with officers

4

restraining him. This was not a case of an officer's split-second decision to use force in the face of a serious threat.

Defendants misstate the facts for their argument that the force used was a "split-second" decision impermissibly opting for their own version of the evidence—that plaintiff was "pushed" against a van, while resisting officers, and "bumped his head"—when video clearly shows Defendant McCue deliberately slamming Plaintiff's head into a van after his surrender. Defendants claim that Plaintiff "did resist arrest" is refuted by Plaintiff, Cynthia Yanez, and Juanita Yanez's testimony that Plaintiff was doing nothing at the time officers used force. This testimony was corroborated by the cell phone video evidence.

Defendants' citations to *Horton v. Pobjecky*, *Nabors v. City of North Chicago,* and *Williams v. Brooks* are unavailing. Dkt 112 at 7-8. Plaintiff already persuasively distinguished these cases in his response brief at summary judgment. Dkt. 47. These cases all involved active resistance, life-threatening circumstances or flight by the subject. In stark contrast, Mr. Gutierrez sat with his hands raised in surrender while suspected of a traffic violation and misdemeanor obstructing. The force was excessive, and the jury's verdict was supported by the evidence.

**C. Officer McCue is not Entitled to Qualified Immunity**

Defendant McCue is not entitled to qualified immunity now for the same reason he was not entitled to qualified immunity on summary judgment—because it was clearly established in 2020 that police officers may not use significant force against a non-resisting or passively resisting subject. As the Court noted in its ruling at summary judgment, "[i]t is 'clearly established that only minimal force is warranted where the accused is passively resisting.'" Dkt. 65 at 10 (citing *Becker v. Elfreich*, 821 F.3d 920, 928–29 (7th Cir. 2016)). Here, Plaintiff refused repeated orders to exit

the car, but once Officer Meyers broke his window, he put his hands up in surrender and did not resist being arrested.

Defendants introduce a new angle to their qualified immunity analysis—that the time frame in which the use of force occurred was so short that an officer did not need to "reassess his use of force that quickly." Dkt. 112 at 9 (citing *Brumitt*, 102 F.4th at 448). None of the cases cited by Defendants demonstrates that McCue's actions did not violate clearly established law.

In *Brumitt*, the court considered a plaintiff who had previously punched an officer, and was subjected to four quick punches over the course of four seconds, during which plaintiff fell unconscious without the officer's knowledge. 102 F. 4th at 446. Here, McCue's allegedly needed "re-assessment" of the degree of force occurred over a longer time frame – approximately 20 seconds after the window was broken, including 10-11 seconds during which Plaintiff's hands were raised in surrender. This half minute followed six and a half minutes of Plaintiff's passive non-compliance during which Plaintiff and the officers debated Plaintiff's request for a supervisor, and during which there was no physical resistance, evasion or threatening conduct by Plaintiff. There was no force that allegedly needed to be re-evaluated in a split second because McCue's head slam was never justified or reasonable at any point in the sequence of events.

Indeed, a concurring opinion in *Brumitt* highlighted that that holding was a "narrow one," contrasting the 4 second time frame in that case with the 7-15 seconds present in *Strand*, 761 F.3d 822, a situation far closer to this one and where qualified immunity was rejected. *Brumitt*, 102 F.4th at 450-451 (Pryor, J., concurring). Likewise, *Snukis* involved a plaintiff who struck an officer, actively resisted arrest, fled, and was then knocked unconscious. *Id.*, 145 F.4th 734, 738-741.

*Miller v. Gonzalez*, 761 F.3d 822 (7th Cir. 2014), and *Strand*, 910 F.3d 909, support

Plaintiff's position and the jury's verdict. In *Miller*, the Plaintiff actively fled officers, ceased his flight, and then laid on the ground in submission for ten seconds prior to a gratuitous use of force much like Defendant McCue's. 761 F.3d at 829-830 (noting that the plaintiff was visible and "had been motionless for upwards of ten seconds" and reversing summary judgment, intimating that the defendant's conduct would be contrary to clearly established law even considering plaintiff's prior attempt to flee); *see also Brumitt*, 102 F.4th at 449 ("officers must cease their use of force once a suspect is known to be subdued"). In *Strand*, the Seventh Circuit rejected a qualified immunity argument where "up to five, ten, or fifteen seconds may have elapsed" after plaintiff put his hands up prior to force. *Id.*, 910 F.3d at 917.

## II. DEFENDANTS' RULE 59(a) MOTION SHOULD BE DENIED; THE COURT'S EVIDENTIARY RULING WAS CORRECT

Defendants Rule 59(a) motion for a new trial—which is based exclusively on the Court's ruling that Defendants were prohibited from introducing the date Plaintiff was released from prison—does not provide any argument that connects the legal standard to the facts at issue. Defendants repeat arguments already made and rejected, multiple times.

Under Rule 59(a), a new trial is appropriate if a jury's "verdict is against the manifest weight of the evidence or if the trial was in some way unfair to the moving party." *Venson v. Altamirano*, 749 F.3d 641, 656 (7th Cir. 2014). To justify a new trial based on alleged evidentiary error, Defendants must now show that the Court's bar of Mr. Gutierrez's release date resulted in "substantial and injurious effect or influence on the determination of the jury." *Lewis v. Chi. Police Dep't*, 590 F.3d 427, 440 (7th Cir. 2009). "Evidentiary errors satisfy this standard only when a significant chance exists that they affected the outcome of the trial." *EEOC v. Mgmt. Hospitality of Racine, Inc.*, 666 F.3d 422, 440 (7th Cir.2012).

Defendants' argument applying this legal standard is, charitably interpreted, limited to a

single, conclusory statement that barring the release date "prejudiced the Defendants" because that evidence was relevant to Plaintiff's credibility. Dkt. 112 at 15. Defendants have no basis (and do not offer one) to argue that the alleged erroneous ruling could have had a substantial and injurious effect on the outcome.

The only logical conclusion to Defendants' argument is that had the jury heard that Plaintiff served a lengthy prison sentence, they would have decided against him on that improper basis – the precise prejudice that the law and Court's ruling is intended to prevent. "Presenting a 1983 plaintiff's criminal history to the jury presents a substantial risk that the jury will render a defense verdict based not on the evidence but on emotions or other improper motives, such as a belief that bad people should not be permitted to recover from honorable police officers." *Barber v. City of Chicago*, 725 F.3d 702, 714 (7th Cir. 2013). Notably, Defendants cite law that limits cross-examination regarding a conviction "to an identification of each crime charged, the disposition date and the disposition," not the release date or length of sentence. *Edwards v. Thomas*, 31 F. Supp. 2d 1069, 1072 (N.D. Ill. 1999).

Assuming Defendants' perfunctory argument has not been waived entirely,[2] it is abundantly clear, as this Court ruled, that the sentence length/release date had no legitimate bearing on the jury's determinations. R. at 20-22. The entirety of the interaction giving rise to Plaintiff's claims is captured on video recordings, corroborating Plaintiff's account as to what occurred. Plaintiff's testimony was also reinforced by multiple eyewitnesses' testimony. Thus, any bearing that the length of Plaintiff's prison sentence could have had on his credibility cannot be said to be so significant that it would have altered the outcome of the trial. Moreover, Rules 609, 403 and interpreting case law are clear that this 30-year-old felony conviction had diminished probative

---

[2] Perfunctory arguments constitute waiver. *Black & Decker Inc. v. Robert Bosch Tool Corp.*, 371 F. Supp. 2d 965, 970 n. 3 (N.D. Ill. 2005) (citing *Kramer v. Banc of Am. Sec., LLC*, 355 F.3d 961, 964 n. 1 (7th Cir. 2004).

value given its age and the Court's ruling properly took that into account. See *Jones v. Walters*, 2016 WL 1756908, at *3 (N.D. Ill. Apr. 29, 2016); Dkt. 94, Plf. Mot., collecting cases.

The Seventh Circuit has upheld evidentiary decisions on subjects clearly more central and probative than the impeachment value of Plaintiff's time in custody. In *Sanchez v. City of Chicago*, the Seventh Circuit held a district court's bar of a lockup keeper's note that plaintiff did not appear to be intoxicated hours subsequent to his DUI arrest was harmless error. 880 F.3d 349, 359 (7th Cir. 2018); *see also* Fed. R. Civ. P. 61 (error in excluding evidence is not ground for new trial unless justice requires otherwise via disturbance of a party's substantial rights). In *Rascon v. Hardimon*, the Seventh Circuit held that a decision to admit testimony from a medical provider that plaintiff had serious injuries from a police beating was at most, harmless error. 803 F.2d 269, 278-279 (7th Cir. 1986).

## III.     THE DAMAGES AWARD WAS APPROPRIATE

"The Seventh Amendment to the Constitution requires that the Court accord substantial deference to the jury's assessment of compensatory damages." *Spina v. Forest Pres. Dist. of Cook Cnty.*, 207 F. Supp. 2d 764, 771 (N.D. Ill. 2002). Under Rule 59(e), a jury's determination receives substantial deference and may be set aside as contrary to the manifest weight of the evidence only if no rational jury could have rendered the verdict. *Moore ex rel. Estate of Grady v. Tuelja*, 546 F.3d 423, 427 (7th Cir. 2008). Defendants have the burden of showing "no rational jury could have rendered a verdict against them." *King v. Harrington*, 447 F.3d 531, 534 (7th Cir. 2006).

### A.  Compensatory Damages Awarded Were Connected to Plaintiff's Injuries

"The Seventh Circuit has directed district courts to consider three factors when evaluating whether a compensatory damages award warrants a new trial or remittitur: (1) whether the award is monstrously excessive; (2) whether there is a rational connection between the award and the

evidence; and (3) whether the award is roughly comparable to awards made in similar cases. *Spina*, 207 F. Supp. at 771. "We have observed that the 'monstrously excessive' standard and the 'rational connection' standard are really just two ways of describing the same inquiry: whether the jury verdict was irrational." *Adams v. City of Chicago*, 798 F.3d 539, 543 (7th Cir. 2015). The jury's award of compensatory damages of $50,000 was not irrational, is supported by the evidence, and is comparable to awards in similar cases.

What Defendants characterize repeatedly as a "bump on Plaintiff's forehead" was a concussion that concerned his doctor enough to order advanced imaging as soon as possible. R. 336:12-338:21. Plaintiff testified that he experienced throbbing pain, headaches, dizziness, and humiliation. R. 310:19-311:22, 312:6-22. Several witnesses testified about Plaintiff's observable injuries and the force McCue inflicted on Plaintiff. "[T]o determine whether the jury's verdict was irrational, the district court must review the trial record as a whole in the light most favorable to the verdict. This perspective is essential, if we are to preserve the jury's role as the trier of fact." *Adams*, 798 F.3d at 543.

Plaintiff need not present elaborate evidence of his emotional damages. The Seventh Circuit affirmed a ruling that $50,000 in compensatory damages for emotional distress in an employment discrimination case was supported by the evidence despite defendants' challenge that plaintiff's testimony on the subject was brief. *Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1022-23 (7th Cir. 2016). Plaintiff's testimony was supported by other evidence in the case about her work history and "brevity and self-control in a judicial proceeding need not be interpreted as a weak case." *Id.*, at 1023.

The *Gracia* Court noted that "[a]wards in other cases provide a reference point that assists the court in assessing reasonableness; they do not establish a range beyond which awards are

10

necessarily excessive," collecting cases with comparable compensatory awards for emotional distress ranging from $50,000 to $175,000. *Id.*; see also *Adams*, 798 F.3d at 545 (overturning district court's remittitur of multi-million dollar verdicts for excessive force and malicious prosecution). Courts have upheld larger verdicts in excessive force and police misconduct cases. *Mason v. City of Chicago*, 641 F. Supp. 2d 726, 731 N.D. Ill. 2009 (collecting cases with compensatory damages verdicts ranging from $450,000 to $2.5 million).[3]

### B. Punitive Damages Were Based on McCue's Malicious and Deceitful Conduct

Punitive damages awarded here are appropriate based upon the evidence presented; they do not constitute an amount that "no rational jury" could have awarded. *Moore*, 546 F.3d at 427. As the Court instructed, pursuant to the Seventh Circuit Pattern Instructions, punitive damages may be levied where a defendant's conduct was "malicious or in reckless disregard of Plaintiff's rights." R. 428. A reasonable jury could conclude that McCue's force, slamming Plaintiff's head into a van, following Plaintiff's surrender to officers, satisfies this standard.

The purpose of punitive damages, per the jury instructions, is to " to punish a defendant for his conduct and to serve as an example or warning to Defendants and others not to engage in similar conduct in the future." R. 428. The jury sent a strong and reasoned message, via punitive damages, with these stated purposes in mind. The jury's question during deliberation reflects the rational nature of their verdict. They asked whether the jury could award punitive damages against an officer they did not find liable for excessive force. This question suggests the jury also believed Defendant Meyers' conduct to be reprehensible and deserving of censure, yet the jury followed the law and awarded no punitive damages against Meyers after finding him not liable.

Courts consider three "guideposts" for review of a punitive damages award: (1) the degree

---

[3] Defendants offered no comparables supporting their argument that compensatory damages should be reduced.

of reprehensibility; (2) the disparity between the harm suffered and the punitive damages award; and (3) the difference between the punitive damages awarded and penalties imposed in comparable cases. *State Farm Mut. Aut. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003). McCue's conduct was reprehensible, the "most significant factor" of these guideposts. *Stewardson v. Titus*, 126 F.4th 1264, 1272 (7th Cir. 2025).

    1.  <u>Degree of Reprehensibility</u>

There are five reprehensibility factors, *id.*, and all favor Plaintiff or are inapplicable here. First, courts consider whether the harm caused was physical or economic. *Id.* Here, Mr. Gutierrez's harm was physical, and was not, as Defendants repeatedly assert, "minimal." Dkt 112 at 12. He suffered a concussion and endured degrading humiliation during and after the encounter.

Second, McCue's conduct was in reckless disregard of Plaintiff's safety. Video evidence clearly showed Mr. Gutierrez with his hands up being grabbed from his car by both officers and captured McCue grabbing the back of Plaintiff's skull and throwing it into the van.

Third, courts consider whether the target of the conduct had financial vulnerability, which is not applicable to these facts. However, there was evidence to support Plaintiff's emotional and physical vulnerability in that he was concerned for his safety and rights after being stopped in his own driveway for a turn signal violation.

Fourth, Defendant McCue's conduct involved repeated actions. Although he slammed Plaintiff's head once, he followed that with a course of deceit that extended years into litigation, denying he grabbed George's head in sworn statements and then characterizing the malicious force as a trained police technique and the head "bump" as inadvertent. In that respect, he showed a lack of remorse or concern for Plaintiff's rights or safety, and a likelihood that he would repeat similar conduct.

Fifth and finally, McCue's conduct was the result of malice and deceit – the force was demonstrably vindictive and gratuitous and then McCue denied and lied about his conduct. In response to Mr. Gutierrez trying to assert what he thought were his rights, McCue maliciously and extra-judicially punished Plaintiff for his perceived defiance. McCue then falsely denied/omitted grabbing Plaintiff's head in sworn interrogatories and deposition testimony, and concocted an alleged "head hold" policing technique that his partner had never used. R. 251:3-14, 278:23-279:15, 355:11-359:15, 383:4-13.

2. <u>Ratio to Compensatory Damages</u>

The ratio of the punitive damages award to the compensatory damages award is another guidepost, albeit one less important than reprehensibility. *Stewardson*, 126 F.4th at 1272. Defendants posit a "rule of thumb" corresponding to a "recommended single-digit" ratio of compensatory to punitive damages. Dkt. 112 at 13. However, "[m]athematical ratios are not the be-all and end-all in punitive-damages analysis." *Sommerfield v. Knasiak,* 967 F.3d 617, 622 (7th Cir. 2020) (noting cases where ratios of 37:1 and 50:1 were upheld); see also *Green v. Howser*, 942 F.3d 772, 782 (7th Cir. 2019) ("We have approved ratios as high as 37:1, as well as more modest but still larger ratios like 5:1 and 6:1.") Rules of thumb are not brightline rules of law, and in civil rights cases, the ratio analysis has little weight, given that "under federal law, when a jury finds a constitutional violation under a § 1983 claim, it may award punitive damages even when it does not award compensatory damages." *Erwin v. Cnty. of Manitowoc*, 872 F.2d 1292, 1299 (7th Cir. 1989).

Defendant McCue's conduct—committing a violent act while holding a position of authority and trust, and then concealing and lying under oath about that conduct—supports the jury's departure from a single-digit ratio. McCue degraded every resident of Aurora, and every

police officer in the state, when he acted as he did. A 20 to 1 ratio is appropriate to punish McCue and to deter future misconduct by McCue and any other officer. It is clear the jury found McCue's conduct to be reprehensible separate and apart from the extent that he injured Mr. Gutierrez; thus, their verdict serves the purpose of punitive damages against law enforcement officers and section 1983 suits.

### 3. Comparable Punitive Damages Awards

The final guidepost, comparable damages, is similarly less important than reprehensibility, *Stewardson* 126 F.4th at 1272. This factor examines whether the verdict is "roughly comparable" to awards in similar cases, but does not require perfectly analogous cases and awards to uphold a jury's verdict. "The fact-specific nature of claims, particularly in the civil rights context, results in a dearth of apples-to-[oranges] comparisons, so addressing every existing case (or even all of the cases cited by the parties) would be a fool's errand." *Torres v. City of Chicago,* 2016 WL 4158914, at *25 (N.D.Ill.) (citing *Hardy v. City of Milwaukee*, 88 F. Supp. 3d 852, 883 (E.D.Wis. 2015).

Comparable compensatory and punitive damages verdicts support leaving the jury's verdict intact. See *Williams v. Billington*, 2025 WL 1807755, at *9 (S.D. Ill. 2025) (finding $1,000,000 punitive damages award appropriate and collecting cases with punitive awards in multi-millions). Although *Williams* differs from this case as it involved sexual assault, the Court noted the reprehensibility involved in a law enforcement officer assaulting an inmate under their care, which is similar to the dynamic here. Mr. Gutierrez felt unsafe from the beginning of the stop and McCue's malicious head slam, while Plaintiff's loved ones watched helplessly, proved Plaintiff's fear was warranted. In *Wrice v. Byrne*, 488 F. Supp. 3d 646 (N.D. Ill. 2020), the Court declined to remit $1.2 million punitive damage award, noting "[d]efendants' conduct in their position of public trust justifies a substantial punitive damages award," and "the Seventh Circuit

14

takes police brutality very seriously as grounds for punitive damages." *Id.* at 679 (citing *Kunz v. DeFelice*, 538 F.3d 667, 679 (7th Cir. 2008).

Defendants proffer recent, lower punitive damages awards, but there is no indication that the defendants in those cases used force so gratuitously and vindictively, and then lied under oath denying the conduct that was plainly captured on video. Moreover, the cases cited by Defendants include one in which the punitive damages award was not far from the $1,000,000 award here. (*Stewardson*, 126 F.4th 1264, in which the jury awarded $850,000 in punitive damages).

A final important consideration is the purpose of section 1983 cases, generally. "Congress expressly recognized that a plaintiff who obtains relief in a civil rights lawsuit does so not for himself alone but also as a private attorney general, vindicating a policy that Congress considered of the highest importance." *City of Riverside v. Rivera*, 477 U.S. 561, 575 (1986). "[S]ociety has an interest in deterring and punishing all intentional or reckless invasions of the rights of others." *Smith v. Wade*, 461 U.S. 30, 54, 103 S. Ct. 1625, 1639, 75 L. Ed. 2d 632 (1983). "The Supreme Court has long held that punitive damages are among the enforcement mechanisms available in a § 1983 action." *Stewardson*, 126 F.4th at 1272. For this reason, punitive damages are particularly applicable in this case where Mr. Gutierrez brought the lawsuit because, as he testified, police officers are there "to uphold the law" and are held "to a higher standard." "[The officers] still don't have the right to use the type of force they used when they slammed my head against the window. I believe that is just wrong." R. at 330:8-21. Clearly, the jury felt the same and their verdict should stand.

Respectfully submitted,

*s/Amanda S. Yarusso*
*s/Daniel Massoglia*

15

Daniel Massoglia
Benjamin Postone
Hannah C. Marion
First Defense Legal Aid
601 S. California Avenue
Chicago, IL 60612
336-575-6968
daniel@first-defense.org
hannah@first-defense.org

Amanda Yarusso
1180 N. Milwaukee Ave
Chicago, IL 60642
773-510-6198
amanda.yarusso@gmail.com