## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

GEORGE GUTIERREZ,
           Plaintiff,

    v.

CITY OF AURORA, MATTHEW
THOMAS MEYERS, and COREY
MCCUE,
           Defendants.

No. 21-cv-02211

Judge Jeremy C. Daniel

## ORDER

The defendants' motion to reconsider [98] is denied for the reasons stated on the record. Trial Tr. Vol. 2, 211. The defendants' motion for judgment as a matter of law [99] is denied. The defendants' post-trial motion [112] is denied in part and granted in part. The Court denies the defendants' motions for judgment as a matter of law and for a new trial, and grants the defendants' motion to alter or amend judgment. The Court reduces the punitive damages award from $1,000,000 to $250,000.

## STATEMENT

Procedural Background

The complaint alleged that defendants Officers Matthew Meyers and Cory McCue, unlawfully seized plaintiff George Gutierrez (Count I), falsely arrested the plaintiff (Count II), used excessive force against the plaintiff (Count III), failed to intervene (Count IV), and battered the plaintiff (Count V). (R. 6.) The complaint also named the City of Aurora, which employed the defendants, as a defendant. (*Id.*) The Court granted summary judgment to the defendants on Counts I, II and IV, which left Counts III and V for trial. (R. 65.) The plaintiff elected to proceed to trial only on Count III, his excessive force claim. (R. 92.) Following a three-day jury trial, a jury determined that defendant Meyers did not use excessive force against the plaintiff and that defendant McCue did use excessive force against the plaintiff. (R. 102 at 1.) The jury awarded the plaintiff $50,000 in compensatory damages and $1,000,000 in punitive damages. (*Id.* at 2.)

Defendants McCue and the City of Aurora have three motions pending. The first asks this Court to reconsider its ruling that allowed the defendants to introduce the fact of the plaintiff's prior criminal conviction but not the release date of that conviction.

(R. 98.) The second is a motion for judgment as a matter of law under Fed. R. Civ. P. 50(a) that asks the Court to find that the defendant officers' use of force was reasonable and that the defendant officers are entitled to qualified immunity. (R. 99.) The third is a motion for judgment as a matter of law under Fed. R. Civ. P. 50(b) or, in the alternative, a motion for a new trial or to alter and amend judgment under Fed. R. Civ. P. 59(a) and (e). (R. 112.) That motion asks this Court to: (1) find that defendant McCue's use of force was reasonable; (2) find that defendant McCue was entitled to qualified immunity; (3) reduce the punitive damages award to $50,000; and (4) grant a new trial because the Court did not allow the defendants to introduce the plaintiff's release date from prison. (*Id.*)

Date of Conviction

Fed. R. Evid. 609(a)(1) allows a party to attack a witness's character for truthfulness by evidence of a criminal conviction provided the crime was punishable by death or imprisonment for more than one year. Admission of the criminal conviction, however, is subject to Fed. R. Evid. 403. Fed. R. Evid. 609(a)(1)(A). Fed. R. Evid. 403 allows a court to exclude relevant evidence if its probative value is substantially outweighed by a danger of unfair prejudice.

The plaintiff has a 1994 murder conviction and remained incarcerated for that conviction until 2016. The defendants sought to use the plaintiff's 1994 murder conviction to attack the plaintiff's character for truthfulness. The Court allowed the defendants to introduce the fact of that conviction. (*See* R. 96.) The Court concluded that this was sufficient for the defendants' purpose, which was to undermine the plaintiff's testimony. *See Schmude v. Tricam Indus., Inc.*, 556 F.3d 624, 627 (7th Cir. 2009) (explaining that "[t]he rationale for nevertheless allowing a prior crime to be used to undermine testimony is that a person who has committed a serious crime is more likely than a law-abiding person to lie on the stand even if the case in which he is testifying has nothing to do with that crime"). The Court did not, however, allow the defendants to introduce the nature of the conviction. The danger of unfair prejudice from the jury learning the reason for the plaintiff's conviction—murder—substantially outweighed the limited probative value of the conviction, which essentially amounts to an inference that a felon would not be truthful on the stand.

In line with that ruling, the Court also did not allow the defendants to introduce the plaintiff's release date. The defendants sought to introduce the plaintiff's release date because the Court allowed the plaintiff to introduce the date of conviction. The date of conviction was relevant because it would help the jury assess the plaintiff's credibility. An offense committed closer in time is likely to undermine a witness's credibility more than an offense committed decades ago.

The date of release, however, was not relevant. The Court asked the defendants several times to explain how the release date implicated the plaintiff's credibility. Trial Tr. Vol. 1, 19-22; Trial Tr. Vol. 2, 209. The defendants never answered that. *See,*

*e.g.*, Trial Tr. Vol. 2, 209 ("Other than the proposition that is cited in that case, that felons are generally . . . [less credible]."). In denying the defendants' motion to reconsider, the Court explained, "[i]t would only be unfair if the date of his release from confinement had any bearing on his character for truthfulness, or his credibility, and you have not articulated to me how the date of his release bears on his character for truthfulness or his credibility." Trial Tr. Vol. 2, 211. Further, the date of release was unduly prejudicial. The only purpose it served was to imply the serious nature of the plaintiff's conviction, that is, a conviction that resulted in a decades-long sentence and would leave the jury speculating as to the underlying crime. This outweighed the limited probative value of the conviction.

The defendants now seek a new trial based on the Court's exclusion of the plaintiff's release date. "Evidentiary errors warrant a new trial if the evidentiary errors had a substantial and injurious effect or influence on the determination of a jury and the result is inconsistent with substantial justice." *Burton v. E.I. du Pont de Nemours & Co., Inc.*, 994 F.3d 791, 812 (7th Cir. 2021) (citations and quotations omitted). Here, the defendants argue that allowing the plaintiff to introduce the date of conviction "undermined the probative value of [the plaintiff's] conviction" and that excluding the plaintiff's release date denied the defendants' opportunity to test the plaintiff's credibility. (R. 112 at 15.)

That is an interesting argument, considering that the defendants did not argue in closing that the plaintiff's testimony was not credible. At trial, the plaintiff fronted his prior conviction. Trial Tr. Vol. 2, 288. He told the jury that he was convicted in 1994 when he was twenty-one years old. *Id.* He told the jury that he was fifty-years old at the time he testified. *Id.* The defendants did not ask any questions about the conviction. The defendants did not mention the conviction in closing or otherwise attack the plaintiff's credibility during closing. The defendants barely referenced the plaintiff's testimony at all. *See* Trial Tr. Vol. 3, 460 ("Even Mr. Guitierrez when asked how long these symptoms lasted, he said, I don't know, about 7 days I guess.").

More importantly, the defendants still have not explained how the plaintiff's release date bears on the plaintiff's character for truthfulness. And the defendants have not shown that the exclusion of the release date had a substantial and injurious effect or influence on the jury's determination. At trial, the parties repeatedly referenced the recordings of the plaintiff's encounter with the defendants. That makes sense here, as the recordings captured what was said and what was done during the encounter. "A party's substantial rights are affected only when an error is of such great magnitude that it probably changed the outcome of the trial." *Cont'l Vineyard, LLC v. Vinifera Wine Co., LLC*, 973 F.3d 747, 756 (7th Cir. 2020) (citations and quotations omitted). In short, the jury did not have to find the plaintiff credible to find the defendants liable. All they had to do was watch the recordings. As a result, the defendants cannot show that the exclusion of the plaintiff's release date changed the outcome of the trial.

3

Therefore, the Court denies the defendants' motion for a new trial based on the exclusion of the plaintiff's release date.

<u>Use of Force</u>

The defendants moved for judgment as a matter of law under Fed. R. Civ. P. 50(a). The defendants argued that their use of force was reasonable and that they are entitled to qualified immunity. That motion is moot as to defendant Meyers because the jury found him not liable. After trial, defendants McCue and the City of Aurora renewed their motion for judgment as a matter of law under Fed. R. Civ. P. 50(b). The defendants again argued that defendant McCue's use of force was reasonable and that he is entitled to qualified immunity.

Video footage from defendant Meyers' dashboard camera shows that defendant Meyers followed the plaintiff for at least thirty seconds before activating his patrol car's lights. Defendant Meyers' activated his patrol car's lights as the plaintiff made a left turn. Shortly after making that left turn, the plaintiff pulled into a driveway. Defendant Meyers came to a stop near the end of the driveway the plaintiff pulled into. Defendant Meyers exited the patrol car approximately one minute into the video. Defendant Meyers approached the plaintiff, said hello, identified himself, and told the plaintiff that he failed to signal within the required number of feet before turning. Defendant Meyers asked the plaintiff for identification, and the plaintiff told defendant Meyers that it was in his back pocket. After asking the plaintiff where he was headed (home) and where he came from, defendant Meyers asked the plaintiff whether the plaintiff had anything in the car that defendant Meyer's should be worried about. Defendant Meyers then told the plaintiff to remain in his car while defendant Meyers returned to the patrol car. Defendant Meyers returned to his patrol car approximately two minutes into the video.

Approximately five minutes into the video, defendant Meyers had a short conversation with defendant McCue. Defendant Meyers told defendant McCue that the plaintiff was a "registered violent offender and murderer." Defendant McCue asked whether defendant Meyers asked the plaintiff about that, and defendant Myers replied that he would talk to the plaintiff, that there was just one person in the car, and that and that he was "being cool and [defendant Meyers] should be good."

At approximately six and a half minutes into the video, defendant Meyers returned to the plaintiff's car and asked the plaintiff to step out of the car. The plaintiff refused. Defendant Meyers and the plaintiff went back and forth on whether the plaintiff had to get out of the car. The plaintiff asked for a supervisor. This continued for several minutes. The plaintiff spoke in a calm tone during this period.

Approximately eleven minutes into the video, defendant McCue appeared on screen. He pops in and out of view for the next minute and a half with his hands resting on his protective vest. Twelve minutes and forty five seconds into the video, both

4

defendant Meyers and the plaintiff addressed several relatives who came out of the home to observe. The plaintiff raised his voice at this point to communicate with his relatives. Moments later there is an excited exchange between defendant Meyers and the plaintiff during which defendant Meyers repeatedly says "don't do this" and the plaintiff says "don't break my window."

Thirteen minutes into the video, defendant Meyers repeatedly tells the plaintiff to lower the window. Shortly thereafter defendant Meyers repeatedly tells the plaintiff to get out of the car. Approximately thirteen and a half minutes into the video, the plaintiff says, "my hands are right here." A few seconds later, the video shows the defendants slam the plaintiff against a minivan adjacent to the plaintiff's car. The plaintiff hits the minivan headfirst. The force of impact causes the plaintiff to bounce off the minivan. Defendant McCue, who is using one hand to hold the plaintiff's arm, uses his other hand to push the plaintiff's head back against the minivan. This sequence lasted approximately ten to fifteen seconds. The defendants then handcuffed the plaintiff and walked the plaintiff back to defendant Meyers' patrol car. A knot is visible on the plaintiff's head.

A video recorded by one of the plaintiff's relatives captured a different angle of the defendants' interaction with the plaintiff. This video shows the defendants outside the plaintiff's car. This video shows the plaintiff's face, illuminated by defendant Meyers' flashlight. This video shows that, during the "lower the window" exchange, the plaintiff's window is mostly up, perhaps three to five inches from the top. Approximately thirty-six seconds into this video, defendant Meyers places his hands on the partially opened window and pulls it toward himself, shattering the window. Defendant Meyers then reaches inside the plaintiff's car in an effort to open the plaintiff's car door. As defendant Meyers does so, the plaintiff raises both hands with his palms facing forward. With the door open, defendant McCue reaches inside the plaintiff's car and takes the plaintiff's arm. The plaintiff does not resist. Instead, the plaintiff follows as defendant McCue pulls the plaintiff's arm by turning his body and placing a foot outside the car. As the plaintiff stands up outside of this car, defendant McCue pushes the plaintiff into the minivan. The plaintiff does not resist the defendants' efforts to handcuff the plaintiff.

"A court may enter judgment as a matter of law under Federal Rule of Civil Procedure 50(b) if a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." *Price v. Carri Scharf Trucking, Inc.*, 140 F.4th 861, 866 (7th Cir. 2025) (citations and quotations omitted). Police officers have the right to use some degree of physical force to effectuate an arrest provided the use of force comports with the Fourth Amendment's reasonableness standard. *Williams v. Brooks*, 809 F.3d 936, 944 (7th Cir. 2016). "Determining whether the force the officers used is objectively reasonable under the Fourth Amendment requires a case specific analysis that 'must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Snukis v. Taylor*, 145 F.4th 734, 739 (7th

5

Cir. 2025) (citation omitted). Courts "consider 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Id.* (citation omitted). "Force is reasonable only when exercised in proportion to the threat posed, and as the threat changes, so too should the degree of force." *Id.* at 741. For instance, "active resistance" such as kicking, flailing, or swatting an officer's hand warrants more force than passive resistance. *See Dockery v. Blackburn*, 911 F.3d 458, 467 (7th Cir. 2018). Importantly, courts "must remember that field encounters often require law enforcement officers to make split-second decisions in quickly unfolding, highly stressful situations." *Manery v. Lee*, 124 F.4th 1073, 1079 (7th Cir. 2025).

Here, the crime at issue, a failure to signal, was not severe. The plaintiff was not an immediate threat to the officers or others. For more than ten minutes, the plaintiff and the defendants went back and forth about whether the plaintiff would exit his car. The communication was relatively calm with two exceptions. The first is when the plaintiff addressed his relatives, and the second is shortly before defendant Meyers broke the plaintiff's window. Up to that point, the defendants had a relatively relaxed posture toward the plaintiff. Defendant Meyers noted that the plaintiff was "being cool." Defendant McCue had his hands on his protective vest. Throughout this encounter, the plaintiff was visible to the defendants.

At no point did the plaintiff actively resist the defendants by kicking or flailing, and at no point did the plaintiff attempt to flee. Rather, the plaintiff passively resisted by refusing to get out of his car and by refusing to allow the defendants access to his car. Even though the defendants broke the plaintiff's car window, opened the car door, and took the plaintiff's arm, the plaintiff remained calm. The defendants did not have to pull or drag the plaintiff from the plaintiff's car. When the defendants took the plaintiff's arm, the plaintiff attempted to follow the defendants' lead and placed his feet outside the car. Despite that, defendant McCue slammed the plaintiff into the minivan parked by the plaintiff's car. Given these facts, the jury had a legally sufficient evidentiary basis to find defendant McCue liable.

Qualified Immunity

When determining whether an officer is entitled to qualified immunity, courts must consider whether the officer's conduct violated a constitutional right and whether that right was clearly established at the time of the alleged violation. *Strand v. Minchuk*, 910 F.3d 909, 914 (7th Cir. 2018). Here, the defendants argued in their Rule 50(a) motion that defendant McCue is entitled to qualified immunity because he did not violate the plaintiff's constitutional rights. (R. 99 at 5.) This argument fails because, as discussed above, defendant McCue used excessive force against the plaintiff.

The defendants argued in their Rule 50(b) motion that *Brumitt v. Smith*, 102 F.4th 444 (7th Cir. 2024), shows that it was not clearly established that an officer must

reassess his use of force within ten seconds. (R. 112 at 8-9.) The defendants did not make this argument in their Rule 50(a) motion. "Because the Rule 50(b) motion is only a renewal of the preverdict motion, it can be granted only on grounds advanced in the preverdict motion." *Ziccarelli v. Dart*, 142 F.4th 477, 483 (7th Cir. 2025). That alone is reason to deny the defendants' Rule 50(b) motion.

Another reason to deny the defendants' Rule 50(b) motion is that it lacks merit. *Brumitt* is not relevant to this case. Brumitt, the arrestee in that case, actively resisted a police officer. *Brumitt*, 102 F.4th at 446. ("While seated, Brumitt swung his arm at [Officer] Smith, and his open hand hit Smith's face in a roundhouse swing. Brumitt then slurred, 'Get the fuck off me, motherfucker.'"). The officer then struck Brumitt four times in four seconds. *Id.* The officer knocked Brumitt unconscious before delivering the fourth blow. *Id.* Under those circumstances, the Seventh Circuit concluded that "[n]o case clearly establishes that a reasonable officer must reassess his force that quickly." *Id.* at 449. Unlike *Brumitt*, the plaintiff in this case did not strike the officers, and the officers did not deliver multiple blows to the plaintiff.

The other cases cited by the defendants also involved a struggle. *See Snukis v. Taylor*, 145 F.4th 734, 741 (7th Cir. 2025) ("Snukis had several opportunities to comply with the officers' commands but forcefully refused, putting the officers and himself at risk of further harm."); *see also Sallenger v. City of Springfield*, 630 F.3d 499, 504 (7th Cir. 2010) ("The Fourth Amendment requires reasonableness, not immediacy. Everyone agrees that the officers endured a tense and dangerous physical ordeal to subdue and restrain Sallenger, a very large man who was actively psychotic."). That is not what happened here. The plaintiff in this case did not actively resist the defendants. In other words, there was no change in threat to assess.

Instead, this case falls under the established principle that "willful non-compliance [is] not the same as 'actively resisting' but instead a passive 'resistance requiring the minimal use of force.'" *Becker v. Elfreich*, 821 F.3d 920, 927 (7th Cir. 2016). Because defendant McCue's use of force was unreasonable and because it was clearly established that passive resistance warranted the minimal use of force, the defendants have not shown that defendant McCue is entitled to qualified immunity.

<u>Damages</u>

The defendants contend that the compensatory and punitive damages awarded to the plaintiff are excessive and warrant either a new trial or remittitur. (R. 112 at 9-14.) A new trial is appropriate where "the verdict is against the weight of the evidence, the damages are excessive, or if for other reasons the trial was not fair to the moving party." *Abellan v. Lavelo Prop. Mgmt., LLC*, 948 F.3d 820, 830 (7th Cir. 2020). The compensatory damages here are not excessive and are supported by the evidence admitted at trial. A physician testified that the plaintiff visited him on May 1, 2020, and complained of pain and dizziness. Trial Tr. Vol. 2, 335. Following an examination, the physician concluded that the plaintiff had suffered a concussion. *Id.* a 336. The

dashboard camera video showed the knot that formed on the plaintiff's head immediately after defendant McCue slammed the plaintiff into the minivan. The plaintiff testified that he experienced headaches and dizziness for a period following his encounter with the defendants. *Id.* at 310-11. The plaintiff further testified that he felt humiliated in front of his family. *Id.* at 312. This evidence concerning the physical and mental aspects of the plaintiff's injuries supported the jury's award of $50,000 in compensatory damages. Notably, the defendants did not bother to contest this evidence at trial or argue the significance of this evidence. *See, e.g.*, Trial Tr. Vol. 3, 454 ("All this stuff about damages and money, you don't have to worry about that, you go right to the end and you sign your names and your job as jurors are done.").

The evidence also supported the jury's award of punitive damages. The question remains, however, whether the award of punitive damages was grossly excessive. To determine that, "district courts should consider: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the harm (or potential harm) suffered by the plaintiff and the punitive-damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Sommerfield v. Knasiak*, 967 F.3d 617, 623 (7th Cir. 2020).

Here, at a minimum, defendant McCue acted in reckless disregard of the plaintiff's rights. There was no need to slam the plaintiff into the minivan. The Court understands that police officers often face difficult circumstances. But they are professionals who are paid to perform a difficult job. They cannot allow frustration to interfere with their judgment. The plaintiff did not do anything that warranted the amount of force used by defendant McCue. That said, defendant McCue limited the offending conduct. He did not repeatedly slam the plaintiff into the minivan. He did not escalate the force used by striking the plaintiff or using a weapon against the plaintiff. The nature and brevity of the force used places this at the lower end of reprehensibility, at least when it comes to situations involving physical violence.

The disparity between the harm suffered and the punitive-damages award is significant. "As a rule of thumb, an award that exceeds a single-digit ratio generally violates due process." *Stewardson v. Titus*, 126 F.4th 1264, 1273 (7th Cir. 2025). However, the amount of the compensatory damages award is a consideration when looking at that appropriate ratio; a high compensatory damages award supports a lesser ratio whereas a low compensatory damages award supports a higher ratio. *Id.*

Here, the ratio between the punitive damages and compensatory damages is 20:1, which exceeds the single-digit rule of thumb. And the compensatory damages award, while modest, is not small. This is not an instance where the plaintiff received $5,000 in compensatory damages for the defendant's willful and wanton conduct. *Mathias v. Accor Econ. Lodging, Inc.*, 347 F.3d 672, 674 (7th Cir. 2003) (affirming 37:1 punitive to compensatory damages ratio). Rather, this is an instance where the compensatory damages amount is in the tens of thousands. *See Rainey v. Taylor*, 941 F.3d 243, 255

(7th Cir. 2019) ("To be sure, many of these cases [with ratios greater than 4:1] involved much smaller compensatory awards [in the tens of thousands], which is a relevant factor."). Because the compensatory damages range is in the tens of thousands, the 20:1 ratio raises constitutional concerns.

The cases cited by the parties as comparable to this case do not alleviate those concerns. The defendants cited cases that have either lower punitive damages awards or lower ratios. *See* R. 112 at 13-14 (reporting punitive damages awards ranging from $50,000 to $850,000.) The plaintiff cited cases that have higher punitive damages awards. *See Williams v. Billington*, No. 3:22-CV-1300-MAB, 2025 WL 1807755, at *3 (S.D. Ill. July 1, 2025) ($500,000 in compensatory damages and $1,000,000 in punitive damages); *and Wrice v. Byrne*, 488 F. Supp. 3d 646, 652 (N.D. Ill. 2020) ($4,000,000 in compensatory damages and $1,200,000 in punitive damages). These cases do nothing more than illustrate that there is a wide range of punitive damage awards available to plaintiffs.

One case cited by the plaintiff is particularly instructive, however. In *Kunz v. DeFelice*, 538 F.3d 667, 671 (7th Cir. 2008), police officers kicked the plaintiff as they handcuffed him, breaking his rib. Officers transported the plaintiff to the police station, where an officer repeatedly punched the still-handcuffed plaintiff. *Id.* The Seventh Circuit determined that a 9:1 ratio between punitive damages ($90,000) and compensatory damages ($10,000), was appropriate. *Id.* at 679 ("Moreover, even accepting the characterization of the $90,000 damages award as punitive, the ratio to compensatory damages is still in the single-digits—9:1—nowhere near the 500:1 ratio overturned in *Gore*.").

This leads the Court to conclude that a single digit ratio resulting in a punitive damages award in the hundreds of thousands of dollars is appropriate. Here, the conduct is not as reprehensible as that in *Kunz*, and the compensatory damages award is higher than in *Kunz*. Both factors indicate that a lower ratio is appropriate. But, in awarding $1,000,000 in punitive damages, the jury clearly intended to have a significant deterrent effect. That indicates that a ratio greater than 4:1 is appropriate. In line with the cases discussed in *Rainey v. Taylor*, 941 F.3d at 255, the Court finds that a ratio of 5:1 is appropriate. Therefore, the Court grants the defendants' motion for remittitur and reduces the punitive damages award to $250,000.

Date: November 14, 2025

JEREMY C. DANIEL
United States District Judge

9